(No. 78011

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JOSEPH MILLER, Appellant.

*Opinion filed August 2, 1996.—Rehearing denied September 30, 1996.*

McMORROW, J., specially concurring.

Charles M. Schiedel, Deputy Defender, and Allen H. Andrews, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield,

and Kevin W. Lyons, State's Attorney, of Peoria (Barbara A. Preiner, Solicitor General, and Arleen C. Anderson and Penelope Moutoussamy George, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

Following a jury trial in the circuit court of Peoria County, the defendant, Joseph Miller, was convicted of six counts of first degree murder. 720 ILCS 5/9—1(a) (West 1992). The same jury found the defendant eligible for the death penalty on the basis of the defendant's having killed more than one individual. 720 ILCS 5/9—1(b)(3) (West 1992). The jury determined that there were no mitigating factors sufficient to preclude imposition of a sentence of death. The trial court sentenced defendant to death. The defendant's sentence has been stayed (134 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d R. 603). For the reasons which follow, we affirm the defendant's conviction and sentence of death.

On appeal to this court, defendant argues that: (1) the trial court erred in failing to suppress statements he made to the police; (2) the trial court erred in admitting DNA evidence; (3) evidence that he committed other crimes should not have been admitted; (4) the trial court improperly allowed hearsay testimony regarding his possession of a car; (5) a detective should not have been allowed to testify about women's clothing recovered from defendant's apartment; (6) the prosecutor made improper comments during the closing argument at the second stage of the capital sentencing hearing; (7) the jury instructions used at the capital sentencing hearing did not reflect the law; and (8) the death penalty is unconstitutional.

## BACKGROUND

In September of 1993, the nude bodies of three women, Marcia Logue, Helen Dorrance and Sandra Csesznegi, were found in rural Peoria County. The body of Marcia Logue was found in a drainage ditch in the 500 block of South Cameron Lane on September 18, with a pillow case stuck in her mouth. The body of Helen Dorrance was found 50 feet from Logue's body on the same date. The body of Sandra Csesznegi was found in a drainage ditch near Christ Church Road on September 26. Csesznegi's body was in a state of advanced decomposition. All three women were known prostitutes in the Peoria area.

The defendant was charged with six counts of first degree murder for the murders of Logue, Dorrance and Csesznegi. The trial was moved to Sangamon County due to extensive pretrial publicity.

At trial the following evidence was elicited. Marcia Logue had last been seen alive on September 15, 1993, entering a maroon-colored car which was driven by a white male in his forties or fifties. Helen Dorrance was last seen alive on September 11, 1993. Sandra Csesznegi was last seen alive on September 15, 1993.

On September 29, 1993, at approximately 11:30 p.m., Detectives Rabe and Pyatt of the Peoria police department and Detective Hawkins of the Peoria County sheriff's department went to the defendant's Peoria apartment to question him about crimes in the Peoria area. The defendant allowed the detectives into his apartment and consented to a search of his apartment. He then voluntarily accompanied the detectives to the Peoria County sheriff's department. During the ride to the sheriff's department the defendant asked the detectives what they wanted to talk to him about. The detectives told the defendant that they would discuss the matter when they arrived at the sheriff's department. The defendant then stated that he knew what all this

was about; that it was "about the prostitutes in the newspaper." At that time, defendant was read *Miranda* warnings.

The defendant was questioned at the sheriff's department, where he denied any knowledge of the murders of the three women. During the questioning the defendant identified as his a knife obtained during a search of a maroon Oldsmobile owned by Bernice Faggott. The defendant stated that the police would not find any blood on the knife. When asked to explain this statement, the defendant replied that he thought Detective Pyatt might have believed there was blood on the knife because of the missing women and said that he had anticipated the police would be calling. The defendant claimed that the knife fell out of his pocket when he was a passenger in Faggott's car.

At about 8:30 the next morning, the defendant agreed to accompany Detectives Rabe and Hawkins to Cameron Lane. Detective Rabe testified that the group first stopped at the defendant's apartment so that the defendant could retrieve medication. Detective Rabe stated that during the drive, he and Detective Hawkins were speaking about the three bodies. When the detectives reached Cameron Lane, Detective Rabe asked the defendant if the bodies had been dumped at the same time. The defendant replied that the bodies had been dumped at different times and stated that the bodies were placed in a manner so that they could not be found. The defendant then directed the detectives to Christ Church Road near where Csesznegi's body was discovered. The defendant did not make any reference to the precise area where Csesznegi's body was found, but did state that the area stuck in his mind for some reason. Throughout the drive the defendant denied having killed the three women.

The search of defendant's apartment revealed two

robes, female underwear, a broken mini-blind rod and a brown and white cloth covered with what appeared to be dried blood. The police also recovered pillows and a mattress from defendant's bedroom. These items had reddish-brown stains. Blood splatters were also found on a wall of the bedroom and the bed's headboard. A later search revealed a glove, a throw rug and more women's underwear. During the second search, the police collected hair and fibers.

Crystal Taylor, a deputy United States marshall, testified about a conversation she had with defendant at defendant's request on February 1, 1994. Taylor testified that when she and defendant were discussing the three women defendant stated, "[F]rom the strangulation I am convinced I did these three." The defendant indicated to her that he was afraid to go into his bedroom because bad things had happened there. The defendant also spoke to Taylor about the three women and looking for dump sites off a road.

Dr. Mary Jumbelic, a forensic pathologist for Peoria County, testified about the autopsies that she conducted on the bodies. Logue's body revealed extensive injuries, including stab wounds and ligature marks on her neck, left wrist and right ankle. Logue had been the victim of a sexual assault. Other marks on Logue's body were consistent with those that would be inflicted by the mini-blind rod recovered from the apartment. Logue died as a result of multiple stab wounds, blunt trauma, gagging of the mouth and strangulation. Dorrance had been dead longer than Logue and was also the victim of a sexual assault. She died as a result of asphyxia, consistent with strangulation. Jumbelic believed that Csesznegi had been dead for more than a week when she was found because of the advanced decomposition of her body. The injuries to Csesznegi's body showed that she too had been strangled.

Other testimony revealed that a maroon Oldsmobile registered to Bernice Faggott was reported missing on September 4, 1993. It was recovered in Peoria a few blocks from the defendant's apartment on September 22, 1993. When the car was searched, the police discovered a rug in its trunk, a knife wedged between the front seats, and dark stains on the back seat. Dennis Hall testified that the defendant knew Faggott as early as July of 1993. Samuel Voight, who owned property near Faggott's home, testified that he saw defendant enter Faggott's screened-in porch on August 28, 1993.

James McGovern, a security guard at defendant's apartment complex, testified that he saw the defendant driving a maroon Oldsmobile on two occasions in early September of 1993. The defendant told McGovern that the car belonged to a friend. Mary Decher and Daniel Mayes testified that they rode in a maroon car with the defendant during the last week of August 1993. The defendant told Decher and Mayes that he was transporting the car to another location for a dealership. When Mayes questioned the defendant about an insurance card he found in the glove compartment with the name "Bernice" on it, the defendant stated that a friend had lent him the car while the friend was on vacation. Mayes testified that, on another occasion, the defendant told him that two guys had stolen the car and defendant needed to get rid of it by setting it on fire. The defendant told Mayes that he had wiped any fingerprints from the car and left it on a street in Peoria. When the defendant went to get the car the next day, it was missing. Mayes and Decher testified that a rug, similar to the one found by the police in the trunk of the maroon Oldsmobile, had been stolen off a chain link fence at their home around the middle of September.

Glenn Schubert, a forensic scientist, testified regarding the hair and fibers recovered from the defendant's

apartment, Logue's body and the maroon car. Schubert stated that debris from the pillow case found in Logue's mouth was consistent with the defendant's pubic hair. Other fibers on the pillow case matched fibers taken from a throw rug located in the defendant's apartment and fibers collected from the defendant's living-room floor. Several fibers taken from Logue's body also matched fibers collected from the defendant's living-room floor. Hairs recovered from the maroon Oldsmobile were consistent with the defendant's hair and several acrylic-like fibers from the car were consistent with the fibers found on defendant's floor.

The State's DNA expert, William Frank, testified that seminal fluid recovered from Logue matched that of defendant. Such a match would occur in 7% of the Caucasian population. Blood recovered from underneath Logue's fingernails also matched that of defendant and such a match could be expected in 1 in 465 million Caucasians. Bloodstains from a magazine, mattress, pillow and towel found in the defendant's apartment and from the seat of Faggott's car matched that of Logue. Such matches would occur in 1 in 1.1 trillion Caucasians. Further, blood found on a napkin and a pillow taken from the defendant's apartment matched Dorrance's DNA profile, with such a match occurring in 1 in 466 billion Caucasians. Another bloodstain on one of defendant's pillows matched the DNA profile of Csesznegi with such a match occurring in 1 in 1 billion Caucasians. On cross-examination, Frank conceded that there were only five billion people in the world.

The defendant did not testify on his own behalf. The parties stipulated that several dark-colored cars had been seen near Cameron Lane on September 16 and 17, 1993. In addition, a resident who lived in the area where the bodies were found saw a pickup truck with a construction rack and lettering on the side. On several

occasions, the resident saw the truck stop and its occupant look around.

The jury returned a verdict of guilty on all six counts of first degree murder. The same jury found the defendant eligible for the death penalty, as defendant was over the age of 18 and had been convicted of murdering at least two individuals. At the second stage of the sentencing hearing, the State presented as aggravation evidence the defendant's convictions for two murders in 1977 and one armed robbery in 1978. The defendant was sentenced to terms of 15 to 30 years for each of those murders and a term of four to eight years for the armed robbery. Jack Thurmon, a Department of Corrections' parole agent, testified that the defendant was released from prison in April of 1993 to a mission in Cook County. Thurmon later learned that defendant had travelled to Peoria by September 1993.

The defendant presented the testimony of two psychiatrists as mitigation evidence. Dr. Sohee Lee testified that defendant suffered from disassociative amnesia and an antisocial personality. Dr. Lee linked the disassociative amnesia to the emotional, physical and sexual abuse defendant received during his childhood. Dr. Lee commented that the defendant had been in an orphanage until he was six and was later sexually abused by his mother. Dr. Lee did state that the defendant was happy in September 1993, as one of his friends had sent him a bus ticket to travel to Peoria and his friend and other church members had helped him establish his life in Peoria. Dr. Robert Chapman testified that defendant suffered from disassociative disorder with multiple personality disorder type.

At the conclusion of the second stage of the sentencing hearing, the jury found no mitigating circumstances sufficient to preclude imposition of the death penalty. The defendant was sentenced to death for the three

murders. Defendant's post-trial and post-sentencing motions were denied.

## DISCUSSION

### Trial

#### *Suppression of Evidence*

The defendant alleges that the trial court erred in denying a motion to suppress various statements he made to the police on September 29 and 30, 1993. The defendant specifically points to the statements he made (1) in the police car on the way to the sheriff's department and at Cameron Lane and Christ Church Road; (2) about the knife found in Faggott's car; (3) about being in Faggott's car; and (4) about a photograph of a mattress with blood on it. The defendant claims that the statements were involuntary and the result of coercion and that he was not given proper *Miranda* warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). At a pretrial hearing the trial court concluded that there was no evidence of the involuntariness, either mental or physical, of the defendant's statements.

In support of his contentions, the defendant highlights the events occurring on September 29 and 30. At approximately 11:30 p.m. on September 29, three detectives arrived at the defendant's door while several other police officers remained outside the apartment building. The defendant allowed the detectives inside and he consented to a search of his apartment. The defendant agreed to accompany the detectives to the sheriff's department. The detectives did not tell the defendant why they wanted to speak with him. The defendant suggested that it was about the missing prostitutes. At this juncture, defendant was read *Miranda* warnings.

At the sheriff's department the defendant was placed in an interview room and questioned periodically

through the early morning hours of September 30. At about 8:30 a.m., the defendant was taken on a drive to Cameron Lane. The defendant was returned to the jail at approximately 11 a.m. He was left alone until 5 p.m. when he was questioned and taken on another car ride. After defendant was returned to the sheriff's department, he was questioned again. At 7:30 p.m. on September 30 the defendant was read a second set of *Miranda* warnings.

A trial court's ruling on a motion to suppress will not be disturbed unless that ruling is manifestly erroneous (*People v. Garcia*, 97 Ill. 2d 58, 74 (1983)) and a trial court's ruling that a statement is voluntary will not be disturbed unless that ruling is against the manifest weight of the evidence (*People v. Redd*, 135 Ill. 2d 252, 292-93 (1990)). "Whether a statement is voluntarily given depends upon the totality of the circumstances. The test of voluntariness is whether the statement was made freely, voluntarily and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he confessed." *People v. Clark*, 114 Ill. 2d 450, 457 (1986).

In the instant case, the totality of the circumstances shows that defendant's statements were voluntary. The defendant voluntarily accompanied the detectives to the sheriff's department. The detectives did not use force at defendant's apartment and although there were other officers outside the apartment, these officers could not be seen from inside defendant's apartment. Defendant was the one who initially stated that the police were questioning him about the prostitutes. Although defendant was questioned for some period of time, the questioning was not relentless. The detectives described the tone of the questioning as cordial. There were at least 10 breaks and the defendant was given something to drink and the opportunity to use the restroom. The

defendant was given food to eat, at which time he was left alone for approximately one-half hour. The defendant was never handcuffed. In addition, the defendant agreed to accompany the detectives to Cameron Lane and he directed the detectives to Christ Church Road. Before driving to Cameron Lane, the detectives took defendant to his apartment to retrieve medication. Although the defendant now claims that he was not allowed to sleep before 11 a.m. on September 30, the defendant never indicated to the detectives that he wished to sleep, to stop speaking with them, or to consult with an attorney. Nothing in the record reveals that the defendant's statements were procured through coercion. Thus, the trial court's conclusion that the defendant's statements were voluntary is not against the manifest weight of the evidence.

The defendant also claims that the statements he made in the car at Cameron Lane and his actions in directing the detectives to Christ Church Road should have been suppressed because he had not been given adequate and timely *Miranda* warnings. Defendant states that the car trip occurred at approximately 8:30 a.m. on September 30 and that the last time he had been read *Miranda* warnings was the prior day when he was driven from his apartment to the sheriff's department after 11:30 p.m.

This court has recently stated that "fresh *Miranda* warnings are not required after the passage of several hours." *People v. Garcia*, 165 Ill. 2d 409, 425 (1995). A new set of *Miranda* warnings is required "only in those situations where a substantial probability exists that warnings given at a previous interrogation are so stale and remote that a substantial possibility exists that the suspect was unaware of his or her constitutional rights at the time subsequent interrogation occurs." *Garcia*, 165 Ill. 2d at 426. The totality of the circumstances

should be considered in determining whether a defendant understands his constitutional rights in post-*Miranda* questioning. *Garcia*, 165 Ill. 2d at 426.

The totality of the instant circumstances shows that the defendant was aware of his constitutional rights during the drive around rural Peoria County. Although it had been several hours since the defendant had been read *Miranda* warnings, the detectives and the defendant had been discussing the instant murders and the disappearance of Faggott throughout this time. The breaks that were taken were not for such long periods of time that the warnings became stale and the questioning always resumed. The defendant agreed to accompany the detectives on the car trip and was the one who directed the detectives to Christ Church Road. Additionally, the defendant had prior experience with the criminal justice system, further evidencing his knowledge of the right to remain silent and to an attorney. See *Garcia*, 165 Ill. 2d at 426. Thus, the *Miranda* warnings given to defendant on September 29 were not so stale and remote that the defendant was unaware of his rights. The trial court's decision to deny the motion to suppress was not manifestly erroneous.

### Admission of DNA Evidence

Defendant argues that the trial court erred in qualifying Frank to testify about the general acceptance and reliability of deoxyribonucleic acid (DNA) evidence and in admitting the DNA evidence at his trial. The trial court held a pretrial hearing on the State's motion to admit DNA evidence. Frank was the only individual to testify at the hearing on behalf of the State. The defendant chose not to present any witnesses or evidence, notwithstanding that he had been provided the time and funds to secure an expert. After hearing testimony on Frank's background and training, the trial court qualified him as an expert. Frank then testified regard-

ing the Restriction Fragment Length Polymorphism (RFLP) method of testing DNA and the manner in which DNA matches are calculated, including the manner in which such calculations are made at the Illinois State Police Bureau of Forensic Sciences, where Frank is employed. Frank testified that the techniques used by his laboratory in calculating DNA matches and their frequency in a population are similar to those used by the FBI. After hearing Frank's testimony, the trial court held that based on prior precedent in Illinois[1] , the DNA procedures outlined in Frank's testimony were generally accepted in the particular scientific field and such testimony and DNA calculations would be allowed at defendant's trial.

Addressing the merits of defendant's arguments necessitates a brief account of DNA profiling.[2] DNA is the genetic code which is found in the cells of the human body. A DNA molecule is composed of over three billion "base pairs" of four different chemicals: adenine, thymine, cytosine and guanine. The particular pattern

---

[1]Although the trial court did not mention the cases it was relying on, the following cases had been decided at the time of the hearing on the State's motion to admit the DNA testimony: *People v. Stremmel*, 258 Ill. App. 3d 93 (1994); *People v. Watson*, 257 Ill. App. 3d 915 (1994); *People v. Mehlberg*, 249 Ill. App. 3d 499 (1993); *People v. Miles*, 217 Ill. App. 3d 393 (1991); *People v. Lipscomb*, 215 Ill. App. 3d 413 (1991). All of the cases agreed that the theory underlying DNA profiling and the RFLP matching technique is generally accepted in the relevant scientific community. Unlike the other courts, the *Watson* court found that the "fixed bin" and product rule methods of calculating the statistical probability of a match are not generally accepted.

[2]This court's discussion of DNA profiling is based largely on the testimony which Frank gave at the pretrial hearing. For a broader discussion of DNA profiling see *State v. Anderson*, 118 N.M. 284, 881 P.2d 29 (1994), *Springfield v. State*, 860 P.2d 435 (Wyo. 1993), or *United States v. Jakobetz*, 955 F.2d 786 (2d Cir. 1992).

of these base pairs dictates an individual's genetic characteristics. Most of a DNA molecule is the same from person to person. DNA profiling focuses on those parts of the DNA molecule where there is a significant variation of a base pair pattern. The areas of significant variation are referred to as "polymorphic," and base pair patterns in polymorphic areas are called "alleles." There are approximately 3 million distinguishable polymorphic sites between individuals. Although an examination of all of these polymorphic sites is not currently feasible, an examination of a small number of polymorphic sites can establish a DNA profile which can be compared to that from another DNA sample.

Restriction Fragment Length Polymorphism is a six-step process which allows an analyst to physically see the results of a DNA profile in the form of bands. Since the length of polymorphic DNA fragments differs between individuals, individuals also tend to have different positioning of their bands on a DNA print, called an autoradiograph or autorad. An analyst makes a visual comparison of DNA band patterns to determine whether known and unknown DNA samples came from the same source, whether the samples did not come from the same source or whether the comparison was inconclusive. If an unknown DNA sample has not been excluded from a comparison, a computerized measurement program is used to compare the lengths of the DNA fragments. If the DNA band patterns fall within a certain range, the samples are declared a match.

For a match to be meaningful, a statistical analysis is required. The statistical analysis determines the frequency in which a match would occur in a database population. In this case, Frank used the fixed bin method of determining the frequency of an occurrence. The process of binning is a way of counting or grouping bands and determining the frequency of the bands. The

Hardy-Weinberg Equilibrium is used to determine the frequency of a particular band combination. Stated simplistically, the frequency of one band is multiplied by the frequency of a second, and so on. The product from this calculation is then multiplied by two to account for an individual inheriting one strand of DNA from his mother and one strand from his father. This result constitutes the statistical frequency of a match within a certain population. This process of binning and determining the frequency is also known as the product rule.

We turn first to defendant's allegation that the trial court erred in qualifying Frank as an expert in DNA. Whether an individual is an expert on a particular subject is a matter generally reserved to the sound discretion of the trial court. *Schaffner v. Chicago & North Western Transportation Co.*, 129 Ill. 2d 1, 36 (1989). An individual will be allowed to testify as an expert if his experience and qualifications afford him knowledge which is not common to laypersons, and where such testimony will aid the trier of fact in reaching its conclusions. *People v. Novak*, 163 Ill. 2d 93, 104 (1994). An expert need only have knowledge and experience beyond that of the average citizen. *Novak*, 163 Ill. 2d at 104. There is no predetermined formula for how an expert acquires specialized knowledge or experience and the expert can gain such through practical experience, scientific study, education, training or research. *Novak*, 163 Ill. 2d at 104.

In the instant case, the trial court did not abuse its discretion in concluding that Frank was an expert on issues involving DNA. The record reveals that through education, training, research and experience, Frank possessed knowledge which was not common to the average citizen. Frank has a bachelors degree in chemistry and biology and was working toward his masters degree in

biology with his thesis being on DNA extraction methods. Frank had taken several genetics courses and had attended seminars and classes on DNA methods at both the FBI and private laboratories. He has been certified by the American Board of Criminalistics and has been subject to periodic testing on DNA issues. Thus, the trial court did not abuse its discretion in allowing Frank to testify.

Since Frank was competent to testify as an expert, we must next consider whether the trial court properly admitted the DNA evidence. Before this court defendant argues that the trial court erred in admitting the DNA evidence in light of *Watson*, which he claims requires a finding that the DNA evidence was inadmissible. Defendant further asserts that Frank's testimony and methodology were not valid because the DNA testing was done by the Illinois State Police lab rather than by the FBI or a private lab and by a person with only a bachelors degree rather than a doctorate.

The decision of whether to admit expert testimony about a new scientific technique is committed to the sound discretion of the trial court. *People v. Eyler*, 133 Ill. 2d 173, 212 (1989). Illinois follows the *Frye* standard for the admission of novel scientific evidence.[3] *People v. Baynes*, 88 Ill. 2d 225, 241 (1981) (discussing *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)). *Frye* requires that the evidence be generally accepted in the relevant

---

[3]Recently the United States Supreme Court has stated that the *Frye* test no longer applies in federal cases, as Federal Rule of Evidence 702 has superseded *Frye*. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993). Rule 702 allows for a more flexible standard of admissibility based on the reliability and the relevance of the evidence. *Daubert*, 509 U.S. at 591-92, 125 L. Ed. 2d at 481-82, 113 S. Ct. at 2795-96. Neither the defendant nor the State has requested that this court abandon *Frye* and adopt the reasoning of *Daubert*, and we decline to raise and decide the issue *sua sponte*.

scientific community before it can be admitted. *People v. Thomas*, 137 Ill. 2d 500, 517 (1990).

We disagree with the defendant's contention that the trial court erred in admitting the DNA evidence. Based on the documentation the trial court had before it—Frank's testimony and the five Illinois appellate court cases—the trial court did not abuse its discretion in relying on the cases which supported the use of the RFLP technique and the product rule. We note that the defendant was provided access to his own DNA expert, but defendant did not present any testimony which contradicted Frank's testimony. The defendant was provided ample opportunity to cross-examine Frank regarding the procedures he used in conducting the RFLP analysis and in calculating the frequency with which the DNA samples matched in this case. Frank testified that the procedures he used were the same as those used by the FBI. The trial court did not abuse its discretion by relying on the four favorable cases and Frank's testimony rather than relying on *Watson* in making its decision.

We also note that the majority of courts deciding the issue of the admissibility of evidence on the six-step RFLP process have found such evidence to be admissible under several standards of admissibility, including *Frye* and *Daubert*. See, *e.g.*, *Harmon v. State*, 908 P.2d 434, 440 (Ala. 1995); *Taylor v. State*, 889 P.2d 319, 333 (Okla. App. 1995); *State v. Cauthron*, 120 Wash. 2d 879, 896-97, 846 P.2d 502, 511 (1993) (citing 15 cases which support general acceptance of RFLP testing); *United States v. Porter*, 618 A.2d 629, 636 (D.C. App. 1992). There is little question that the RFLP technique itself is generally accepted in the relevant scientific community.

Further, while there has been some controversy over the use of the product rule in calculating the frequency of a DNA match, that controversy appears to be dis-

sipating. Some members of the scientific community originally argued that the product rule is flawed because it assumes that DNA fragments revealed by the DNA processing occur independently and that members of the racial groups represented by a database intermix within their groups at random without regard to religion, ethnicity or geography. *Watson*, 257 Ill. App. 3d at 930 (discussing R. Lewontin & D. Hartl, *Population Genetics in Forensic DNA Typing*, Science, at 1745 (December 20, 1991)). Lewontin and Hartl maintained that reference to a broad database to calculate the frequency of matches is inappropriate because subgroups of individuals may have substantial differences in the frequency of a given DNA fragment. *Watson*, 257 Ill. App. 3d at 930. In fact, the court in *Watson* agreed with these critics and determined that a jury could not be given DNA statistical evidence which was based on the product rule. *Watson*, 257 Ill. App. 3d at 933.

Since the time of the pretrial hearing in this case, the scientific and legal status of the product rule has continued to evolve. The concerns enunciated by Lewontin and Hartl appear not to have been borne out by empirical studies. See Lander and Budowle, *DNA Fingerprinting Dispute Laid to Rest*, Nature, at 735 (October 27, 1994) (criticizing Lewontin & Hartl's subgroup analysis). The most recent courts to consider the use of the product rule have concluded that it is a generally accepted statistical method for estimating the frequency of a DNA match. See, *e.g.*, *People v. Chandler*, 211 Mich. App. 604, 610-11, 536 N.W.2d 799, 803 (1995); *People v. Wilds*, 40 Cal. App. 4th 166, 180-82, 37 Cal. Rptr. 2d 351, 359-60 (1995); *Taylor*, 889 P.2d at 336-37; *Lindsey v. People*, 892 P.2d 281, 293-94 (Colo. 1995) (discussing in detail the findings of Lander and Budowle); *People v. Soto*, 39 Cal. App. 4th 757, 775-78, 35 Cal. Rptr. 2d 846, 857-59 (1994). Therefore, it is evident

that given the testimony the trial court had before it and the current level of acceptance of the RFLP process and the statistical analysis, the trial court did not abuse its discretion in allowing Frank to testify regarding the DNA evidence.

### Evidence of Other Crimes

First, the defendant claims that the trial court erred in failing to sustain an objection to Detective Rabe's testimony regarding the defendant's statements that he dumped the bodies at different times and that he dumped them in such a manner that they would not be found. Defense counsel objected to Rabe's testimony on the basis that the jury would assume the defendant's statements were relevant to the instant case when, in fact, the statements could have been about the murder of Faggott, a murder in Missouri, or the murders the defendant committed in the 1970s. Defense counsel asserted that immediately before Rabe questioned the defendant regarding the two bodies, Rabe and the defendant had been discussing Faggott's murder.

The defendant now claims that he was prejudiced at trial because the State did not link his "dumping" statements to the victims in the instant case. The defendant's argument is without merit as a review of the record evidences that throughout the detectives' entire interview of the defendant, including the car ride, they were discussing the three women, although the questioning may have also focussed on Faggott. The defendant's statements were made at Cameron Lane where the two bodies were recovered and not at the sheriff's department. The 1977 murders had not been mentioned. In addition, the defendant specifically referred to two bodies, not the single body of Faggott or a single body in Missouri. Thus, it is evident that the defendant was speaking of the instant victims and not any others. The trial court did not err in failing to sustain defense counsel's objection to Rabe's testimony.

Second, the defendant contends that the evidence regarding his possession of the maroon Oldsmobile was improperly admitted as it showed that he had a criminal propensity. The defendant argues that the State should have limited its evidence to the simple fact that defendant was seen in the car on several occasions. He argues that (1) the testimony of McGovern, Decher and Mayes regarding his possession of the maroon Oldsmobile, (2) the testimony of Voight regarding his entrance into Faggott's home, and (3) the testimony of Hall regarding his introduction to Faggott were improper because the testimony implicated him in Faggott's murder. Defendant also argues that even if the jury could not have inferred from the testimony that he murdered Faggott, the jury at least could have inferred that he stole her car or burglarized her residence.

The defendant has waived any claims that McGovern, Decher and Mayes' testimony implied that he had committed a crime involving Faggott, her car or her home by failing to object to the testimony at trial as evidence of other crimes. Defense counsel objected to the testimony of McGovern, Decher and Mayes on the basis of lack of foundation (Mayes and Decher) and hearsay (McGovern and Decher). It is axiomatic that a defendant must make a timely objection at trial and must renew the ground for objection in a written post-trial motion to preserve an alleged error for review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Objections at trial on specific grounds waive all other grounds of objection. *People v. Barrios*, 114 Ill. 2d 265, 275 (1986). Thus, the defendant has waived the right to object on the grounds he asserts on appeal.

Nor will we consider the defendant's arguments regarding this testimony under the plain error doctrine. 134 Ill. 2d R. 615(a). The plain error doctrine allows a reviewing court to consider a trial error not properly

preserved when (1) the evidence in a criminal case is closely balanced or (2) the error is so fundamental and of such a magnitude that the defendant was denied his right to a fair trial. *People v. Byron*, 164 Ill. 2d 279, 293 (1995); *People v. Herrett*, 137 Ill. 2d 195, 209-10 (1990). Neither circumstance applies in this case.

Defendant's next contention involves Voight's testimony. Outside the presence of the jury and before Voight's testimony, defense counsel claimed that Voight's testimony would be prejudicial to the defendant, as it linked the defendant to Faggott. The trial judge required an offer of proof and then determined that Voight could testify about seeing the defendant approach Faggott's home on a bicycle and enter her home through a screened-in porch. The trial court did not err in allowing Voight's testimony since the testimony was not prejudicial and the testimony did not imply that the defendant committed a crime involving Faggott. Prior to Voight's testimony, there had been other testimony that the defendant had been introduced to Faggott. Voight's testimony simply emphasized that the defendant knew Faggott and potentially had access to her car. We note that Voight did not testify that he saw the defendant drive off in Faggott's car or leave her home with any items.

In addition, defense counsel did not object to Hall's testimony and, thus, the defendant cannot now claim any error regarding the testimony. *Enoch*, 122 Ill. 2d at 186. Regardless, Hall's testimony was not prejudicial to the defendant, as it merely related that the defendant knew Faggott in July 1993.

Finally, the defendant also asserts that Deputy Taylor's testimony that defendant questioned her regarding the difference between state and federal crimes was improper. The defendant asserts that Taylor's testimony implied that he had committed a

crime other than the three murders for which he was on trial. Taylor's testimony was not improper. She did not testify that the defendant had been convicted of other crimes or was under investigation for other crimes, state or federal. Testimony by a witness of her mere explanation to the defendant of the difference between state and federal crimes without more does not imply to the jury that the defendant had committed crimes other than the ones for which he was on trial. Thus, the defendant was not prejudiced by Taylor's testimony and the trial court did not err in allowing such testimony.

### Hearsay Testimony

Defendant claims that the testimony of Mayes, Decher and McGovern that defendant told each of them that he was transporting the maroon Oldsmobile for a dealership or had borrowed the car from a friend was inadmissible hearsay. At trial, defense counsel did not object to Mayes' testimony on the basis of hearsay nor were any issues regarding Mayes' testimony raised in the post-trial motion. Thus, defendant has waived any hearsay claims regarding this testimony. *Enoch*, 122 Ill. 2d at 186.

With regard to Decher's testimony, defense counsel objected on the basis of hearsay before Decher testified that defendant told her he was transporting the car for a dealership. Defense counsel also objected on the basis of hearsay before McGovern testified that defendant told him the car belonged to a friend. However, the defendant did not raise as error in his post-trial motion the trial court's failure to sustain the objections to Decher's and McGovern's testimony. Rather, defendant claimed in his post-trial motion that Decher's and McGovern's testimony should have been excluded on the basis that it was evidence of other crimes. Such a claim is not sufficient to preserve the prior objection

that the testimony should have been excluded because it was hearsay. Thus, defendant has waived this issue. *Enoch*, 122 Ill. 2d at 186. In addition, we decline to consider defendant's hearsay challenge to the testimony of Mayes, Decher and McGovern under the plain error doctrine, as the evidence in this case was not closely balanced and any alleged error was not so fundamental as to deny the defendant his right to a fair trial. *Byron*, 164 Ill. 2d at 293.

*Admission of Testimony Regarding Women's Clothing*

The defendant argues that the trial court erred in allowing Officer Molleck of the Peoria County sheriff's department to testify regarding several garments he collected from the defendant's apartment. The garments included two robes and women's underwear. Defense counsel objected to the admission of such testimony, arguing that its prejudice outweighed its probative value. The objection was overruled and the officer was allowed to testify about his discoveries. We note that the garments were not admitted into evidence and were not shown to the jury. On appeal, defendant asserts that the testimony regarding these items was not relevant to his prosecution, as the garments had not been linked to any of the three victims. The State counters that the testimony was relevant as it made it more probable than not that the defendant killed the three women.

Questions concerning the admission of evidence are within the discretion of the trial court. *People v. Fierer*, 124 Ill. 2d 176, 195 (1988). For physical evidence to be admitted, the physical evidence must be connected to both the crime and the defendant. *People v. Miller*, 40 Ill. 2d 154, 159 (1968). Likewise, testimony regarding physical evidence is not proper unless that testimony links the physical evidence to both the defendant and the crime.

In the instant case, the undergarments were con-

nected to the defendant, as they were found in his apartment. However, the evidence presented at trial never linked the women's undergarments to any of the three victims. The State did not lay a foundation which showed the undergarments were the women's personal property. Thus, the trial court abused its discretion in allowing Officer Molleck to testify about the undergarments. Such an abuse of discretion, however, was harmless error in light of the overwhelming evidence of defendant's guilt. *People v. Carlson*, 92 Ill. 2d 440, 449 (1982) (evidentiary errors are harmless if properly admitted evidence is so overwhelming that no fair-minded juror could reasonably have voted to acquit the defendant).

## CAPITAL SENTENCING HEARING

### Prosecutorial Comments

The defendant asserts that the prosecutor's rebuttal argument during the second stage of the capital sentencing hearing improperly diminished the jury's sense of responsibility for imposing the death penalty. The defendant points to the prosecutor's statement:

"And this person [defendant] fits the law and the evidence that you have heard both at the trial and at the hearing, a 158 days after he came out from the very place they want to put him back into does not in any manner justify a sentence not of death, but simply fits the bill of a person who has brought himself here and should be sentenced under the laws of Illinois to death."

To support his argument, the defendant relies on *Caldwell v. Mississippi*, 472 U.S. 320, 86 L. Ed. 2d 231, 105 S. Ct. 2633 (1985). In *Caldwell*, the Supreme Court found constitutional error in the prosecutor's argument that the jury's decision to impose death was not final and was automatically reviewable by the state supreme court. The Supreme Court held that the prosecutor's argument violated the eighth amendment by leading

the sentencer to believe that responsibility for determining the appropriateness of the defendant's death rested elsewhere. *Caldwell*, 472 U.S. at 328-29, 86 L. Ed. 2d at 239, 105 S. Ct. at 2639.

A review of the instant record evidences that the prosecutor did not cause the jury to feel less responsible for its decision. The prosecutor did not suggest to the jurors that they were relieved of their responsibility for sentencing the defendant by either the defendant's own actions or the ability of the defendant to seek review of the jury's decision. See *People v. Page*, 155 Ill. 2d 232, 281 (1993). In addition, the jury instructions adequately set forth the jury's role in imposing the death penalty and the jury was instructed that closing arguments were not to be considered as evidence. See also *People v. Moore*, 171 Ill. 2d 74, 116 (1996); *People v. Pasch*, 152 Ill. 2d 133, 204-06 (1992).

The defendant also points to two other comments by the prosecutor during his rebuttal argument which allegedly suggested that the decision of whether to impose the death penalty was not "a vote to kill." The defendant asserts that such comments violated *Caldwell* because they diminished the jury's responsibility by saying a vote in favor of death was not a vote to kill. The comments by the prosecution were in response to defense counsel's urging the jury to elect not to vote to kill, to vote against killing the defendant and to value the sanctity of human life. We find that the prosecutor's comments did not violate *Caldwell* and did not deprive defendant of a fair sentencing hearing.

## Jury Instructions

The defendant first argues that the trial court erred in refusing to give a proposed instruction which stated:

"You need not unanimously agree on the existence of the mitigating factor in order for a juror to consider that mitigating factor in his or her deliberations."

The defendant relies on the case of *Mills v. Maryland*, 486 U.S. 367, 100 L. Ed. 2d 384, 108 S. Ct. 1860 (1988), and asserts that the instructions the jury was given did not preclude the jury from believing that it had to unanimously find that a mitigating factor existed before it could determine whether the factor was sufficient to prevent a death sentence.

The Supreme Court in *Mills* reviewed a capital case where the verdict form contained a list of mitigating circumstances, accompanied by spaces in which the jury could check "yes" or "no" and preceded by a statement that the jury "*unanimously* find[s] that each of the following mitigating circumstances which is marked 'yes' has been proven to exist." (Emphasis added.) *Mills*, 486 U.S. at 384-89, 100 L. Ed. 2d at 400-03, 108 S. Ct. at 1870-72. The verdict form further asked the jury to affirm or deny that it unanimously found that the mitigating circumstances marked "yes" outweighed the aggravating circumstances. The trial court's instructions to the jury emphasized the unanimity requirement. The Supreme Court determined that the verdict form and the instructions violated the Constitution since the jury could have interpreted them as precluding the consideration of all possible mitigating evidence. *Mills*, 486 U.S. at 375, 100 L. Ed. 2d at 394, 108 S. Ct. at 1865-66. Later, the Supreme Court applied the *Mills* decision to overturn a death sentence entered in a case where the sentencing jury was instructed not to consider any mitigating factor which the jury did not "unanimously" find to exist. *McKoy v. North Carolina*, 494 U.S. 433, 442-44, 108 L. Ed. 2d 369, 380-81, 110 S. Ct. 1227, 1233-34 (1990).

As background, the Illinois death penalty statute does not require the jury to reach unanimous agreement as to the existence of any mitigating factors before the jury can decide not to impose the death penalty.

*People v. Ramey*, 152 Ill. 2d 41, 77 (1992). In *People v. Hope*, 168 Ill. 2d 1, 45 (1995), this court discussed the application of *Mills* and *McKoy* to a capital case where the jury was instructed with regard to mitigation as follows:

"If you unanimously find from your consideration of all the evidence that there are no mitigating factors sufficient to preclude imposition of a death sentence, then you should sign the verdict requiring the court to sentence the defendant to death.

If you do not unanimously find from your consideration of all the evidence that there are no mitigating factors sufficient to preclude imposition of a death sentence, then you should sign the verdict requiring the court to impose a sentence other than death."

This court found that these instructions did not convey the impression to the jury that unanimity was required before a mitigating factor could be considered. *Hope*, 168 Ill. 2d at 45. These instructions and the closing argument by defense counsel, who argued that each juror had the power to give death and the opportunity to give life, adequately informed the jury that unanimity was not required to find a mitigating factor sufficient to preclude death. *Hope*, 168 Ill. 2d at 45.

In the present case, the jury was given the same instructions as the jury in *Hope*. In addition, during closing argument, defense counsel repeatedly stressed that each juror had the power to prevent the imposition of the death sentence. Accordingly, we conclude that the jury was properly and sufficiently instructed regarding the consideration of mitigating factors. The trial court acted within its discretion and did not err in refusing the defendant's request for an instruction on the lack of a unanimity requirement in finding mitigating factors.

The defendant next argues that the trial court erred in refusing to give a proposed instruction which stated:

"In deciding whether the defendant should be sentenced to death, however, you are not prevented from consider-

ing any feelings or mercy or compassion you wish to extend toward the defendant."

A similar argument was raised and rejected in *People v. Sanchez*, 115 Ill. 2d 238, 269-70 (1986). See also *People v. Fields*, 135 Ill. 2d 18, 74 (1990); *People v. Stewart*, 104 Ill. 2d 463, 492-93 (1984). In *Sanchez*, the defendant sought an instruction which stated that the jury could "extend mercy to the defendant." This court upheld the trial court's refusal to tender such an instruction on the basis that the jury was instructed that it could consider "any other mitigating factor" and defense counsel presented mitigation evidence and argued for mercy in his closing statement. *Sanchez*, 115 Ill. 2d at 269-70.

The rationale of *Sanchez* equally applies to the instant case. Although the trial court refused the defendant's proposed instruction, the jury was given an instruction which allowed it to consider as a mitigating factor "any other reason supported by the evidence why the defendant should not be sentenced to death." Further, the defendant was allowed to present mitigating evidence, and defense counsel argued for mercy in his closing remarks. Thus, the jury was in a position to consider mercy, or any other mitigating factor, as it saw fit. Thus, the trial court did not err in refusing to give the proposed instruction.

The defendant finally argues that the jury instructions given at his sentencing hearing were unconstitutional in that they failed to guide the jury's discretion. As support for his argument, the defendant cites *United States ex rel. Free v. Peters*, 806 F. Supp. 705 (N.D. Ill. 1992). The decision of the *Free* case has been reversed and its reasoning rejected. *Free v. Peters*, 12 F.3d 700 (7th Cir. 1993). This court has found the decision of the Seventh Circuit Court of Appeals to be sound (*People v. Franklin*, 167 Ill. 2d 1, 29 (1995); *People v. Kokoraleis*, 159 Ill. 2d 325, 333-34 (1994)) and has criticized the rea-

soning on which the district court relied (*People v. Towns*, 157 Ill. 2d 90, 115 (1993)). Thus, we reject the defendant's argument.

## Constitutionality of the Death Penalty

The defendant raises several challenges to the constitutionality of the Illinois death penalty statute (720 ILCS 5/9—1 (West 1992)). This court has previously considered and rejected the arguments which defendant now raises. The defendant has not presented us with any reasons to reach a different result at this time.

The defendant first claims that the death penalty statute violates the eighth and fourteenth amendments because it places a burden of proof on defendant which precludes a sentencer from giving meaningful consideration to mitigation evidence. This court has stated that the death penalty statute does not unconstitutionally cast on a defendant the burden of establishing that a sentence other than death should be imposed. *People v. Mahaffey*, 166 Ill. 2d 1, 34 (1995); *People v. Hampton*, 149 Ill. 2d 71, 116-17 (1992); *People v. Simms*, 143 Ill. 2d 154, 184 (1991). In addition, the statute does not preclude a sentencer from giving meaningful consideration to mitigation evidence. *People v. Page*, 155 Ill. 2d 232, 283 (1993); *People v. Strickland*, 154 Ill. 2d 489, 538-39 (1992).

In a related argument, the defendant asserts that the statute is unconstitutional because it allows the sentencer to consider a vague aggravating factor: namely, "any other reason" (Illinois Pattern Jury Instructions, Criminal, No. 7C.06 (3d ed. 1992)) a defendant should be sentenced to death. This court has consistently rejected the argument that a sentencer's consideration of nonstatutory aggravating factors during the second stage of a capital sentencing hearing results in the arbitrary imposition of the death sentence. *People v. Taylor*, 166 Ill. 2d 414, 439 (1995); *People v. Neal*, 111 Ill. 2d 180, 203 (1985); *People v. Madej*, 106 Ill. 2d 201, 211 (1985).

Finally, the defendant asserts that the death penalty statute is unconstitutional because it does not sufficiently minimize the risk of the imposition of an arbitrary and capricious death sentence. The defendant asks this court to reconsider many of its prior rulings regarding the statute and to consider whether the cumulative effect of all features of the statute renders the statute unconstitutional. This argument has been considered and rejected by this court on numerous occasions. See, *e.g.*, *People v. Edgeston*, 157 Ill. 2d 201, 247 (1993); *Thomas*, 137 Ill. 2d at 549-50; *People v. Phillips*, 127 Ill. 2d 499, 542-43 (1989). The defendant has failed to provide any citation or argument in support of his request. The defendant's arguments are not compelling, and we decline to review the defendant's request.

## CONCLUSION

For the reasons stated, the judgment of the circuit court of Peoria County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, November 19, 1996, as the date on which the sentence of death entered by the circuit court of Peoria County shall be carried out. Defendant shall be executed in a manner provided by the law. 725 ILCS 5/119—5 (West 1992). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*

JUSTICE McMORROW, specially concurring:

I agree that defendant's conviction and sentence of death should be affirmed. I write separately because I believe the majority has erred in its analysis of the trial court's decision to admit the DNA evidence at defendant's trial. Specifically, while the majority states that

it is within the discretion of the trial court to determine that a novel scientific technique has gained general acceptance in the relevant scientific community as required for admissibility under the *Frye* standard (see *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923); *People v. Thomas*, 137 Ill. 2d 500, 517 (1990)), and that this determination will not be reversed absent an abuse of discretion (see *People v. Eyler*, 133 Ill. 2d 173, 212 (1989)), the majority has not, in fact, applied such a standard of review in the case at bar. The majority's analysis is thus inherently contradictory, and can only serve to exacerbate the confusion in our appellate court regarding the proper standard of review to apply against trial court decisions admitting or excluding novel scientific evidence (compare *People v. Heaton*, 266 Ill. App. 3d 469, 476-78 (5th Dist. 1994) (trial court's decision that novel scientific technique is generally accepted in the relevant scientific community is reviewed under traditional abuse of discretion standard), with *People v. Watson*, 257 Ill. App. 3d 915, 923-24 (1st Dist. 1994) ("broad review" may be applied to trial court's determination regarding general acceptance of new scientific technique)).

An abuse of discretion occurs only where the trial court's ruling is against the manifest weight of the evidence. *Mizell v. Passo*, 147 Ill. 2d 420, 425 (1992). By definition, then, a reviewing court may not conclude that a trial court has abused its discretion, or acted within that discretion, based on evidence that was never presented at trial. See *Heaton*, 266 Ill. App. 3d at 478 ("Under [the abuse of discretion standard], we must look at the state of the record as it existed in the trial court at the time the trial court made its determination"). However, that is exactly what the majority has done in the instant case. In its discussion regarding the admissibility of the DNA evidence, the majority cites to a

recent scientific article and several court opinions from other jurisdictions. Both the article and the court opinions conclude that any lingering controversy surrounding the reliability of forensic DNA analysis has abated and, in particular, that the statistical techniques which were employed by the State's expert witness in the case at bar are now generally accepted in the relevant scientific community. Neither the article nor the court opinions were part of the record before the trial court. 173 Ill. 2d at 184. Nevertheless, the majority concludes that "given the testimony the trial court had before it *and the current level of acceptance of the RFLP process and the statistical analysis,* the trial court did not abuse its discretion in allowing [the State's expert] to. testify regarding the DNA evidence." (Emphasis added.) 173 Ill. 2d at 190.

The majority cannot have it both ways. If trial court decisions concerning the general acceptance of novel scientific evidence cannot be reversed absent an abuse of discretion, then upon review, only material which was part of the trial record should be considered by this court. See *Heaton,* 266 Ill. App. 3d at 478. If, on the other hand, the majority believes that it is proper to rely on scientific articles and court cases which were not part of the trial record to determine whether a novel scientific technique has become generally accepted in the relevant scientific community, then the majority must acknowledge that the standard of review is not a simple abuse of discretion standard (see *Watson,* 257 Ill. App. 3d at 923-24).

I believe that the better approach is to recognize that this court may rely on materials which were not part of the trial record to determine whether a scientific technique is generally accepted in the relevant scientific community. In *People v. Eyler,* 133 Ill. 2d 173, 212 (1989), this court, *sua sponte* and without significant analysis,

concluded that trial court decisions regarding the admission of novel scientific evidence should be reviewed for an abuse of discretion. I submit that the all-encompassing abuse of discretion standard adopted in *Eyler* does not permit a reviewing court to adequately address the legal issues raised by trial court applications of the *Frye* standard. What is needed instead is a mixed standard of review. Trial court decisions regarding whether an expert scientific witness is qualified to testify in a subject area, and whether the proffered testimony is relevant in a particular case, should be left to the sound discretion of the trial court. However, trial court decisions regarding the threshold question of whether a scientific technique has achieved general acceptance in the relevant scientific community should be subject to *de novo* review. This *de novo* review should not be limited to the trial record, but should permit the appellate court, where appropriate, to rely on sources outside the record, including legal and scientific articles, as well as court opinions from other jurisdictions to determine the issue of general acceptance in the relevant scientific community.

There are good reasons why the determination of general acceptance in the scientific community should not be left to the discretion of the trial court. Foremost is the fact that the general acceptance issue transcends any particular dispute. As one court has put it, "[t]he question of general acceptance of a scientific technique, while referring to only one of the criteria for admissibility of expert testimony, in another sense transcends that particular inquiry, for, in attempting to establish such general acceptance for purposes of the case at hand, the proponent will also be asking the court to establish the law of the jurisdiction for future cases." *Jones v. United States*, 548 A.2d 35, 40 (D.C. App. 1988). Application of less than a *de novo* standard of review to

an issue which transcends individual cases invariably leads to inconsistent treatment of similarly situated claims. Compare *Heaton*, 266 Ill. App. 3d 469, with *Watson*, 257 Ill. App. 3d 915. The general acceptance of a scientific technique does not change from one courtroom to another; assessments of that general acceptance also should not change from court to court. See *Jones*, 548 A.2d at 40 (and cases cited therein); *Watson*, 257 Ill. App. 3d at 923-24; *State v. Vandebogart*, 136 N.H. 365, 616 A.2d 483 (1992); *Taylor v. State*, 889 P.2d 319, 332 (Okla. Crim. App. 1995); see also *Commonwealth v. Lanigan*, 413 Mass. 154, 158, 596 N.E.2d 311, 314 (1992).

In addition, a *de novo* standard of review which permits reliance on materials outside the trial record is not, in this context, problematic. Under the *Frye* standard, the trial court is not asked to determine the validity of a particular scientific technique. Rather, the court's responsibility is to determine the existence, or nonexistence, of general consensus in the relevant scientific community regarding the reliability of that technique. "Accordingly, because the focus is primarily on counting scientists' votes, rather than on verifying the soundness of a scientific conclusion, there will not be the concerns about witness credibility and hearsay normally associated with citations to empirical or scientific studies whose authors cannot be observed or cross-examined." *Jones*, 548 A.2d at 42; see also Note, *Daubert v. Merrell Dow Pharmaceuticals: Pushing the Limits of Scientific Reliability—The Questionable Wisdom of Abandoning the Peer Review Standard for Admitting Expert Testimony*, 47 Vand. L. Rev. 1175, 1196 (1994) (under the *Frye* standard, "the appellate court [can] take its own head count of experts and determine the extent to which a scientific method [is] accepted").

Moreover, there is nothing particularly novel about the *de novo* standard of review proposed here. Indeed, in

several previous decisions regarding the acceptance of scientific techniques, including *Eyler* itself, this court has engaged in precisely this type of review. See *Eyler*, 133 Ill. 2d at 213-15 (citing court decisions from other jurisdictions to support the conclusion that electrophoretic testing of dried blood is generally accepted in the scientific community); *People v. Zayas*, 131 Ill. 2d 284 (1989) (holding inadmissible hypnotically induced testimony of a witness other than the defendant and citing to scientific articles, law reviews and court opinions from other states); *People v. Baynes*, 88 Ill. 2d 225, 234-45 (1981) (citing law reviews, scientific articles and court decisions from other jurisdictions to support holding that polygraph evidence is inadmissible); *People v. Keith*, 148 Ill. 2d 32, 43-45 (1992) (suppressing results of breath test and citing to a law review, a treatise and a court opinion from another jurisdiction in discussion of the proper procedures for operating a breathalyzer). See also 2 K. Davis & R. Pierce, Administrative Law Treatise § 10.5 (3d ed. 1994) (describing the long tradition of courts relying on sources outside the record for "legislative" facts, *i.e.*, facts that help the tribunal decide questions of law and policy); *New York v. Ferber*, 458 U.S. 747, 758 n.9, 73 L. Ed. 2d 1113, 1123 n.9, 102 S. Ct. 3348, 3355 n.9 (1982) (citing literature describing the effect on children of being a subject in pornographic materials); *People v. McCarty*, 86 Ill. 2d 247, 255-57 (1981) (concluding that the legislature had a rational basis for statutorily classifying cocaine as a "narcotic" drug, based, in part, on a review of scientific literature).

Of course, when a reviewing court relies on materials which are not in the trial record—especially court opinions from other jurisdictions—to resolve the general acceptance question, care must be taken so that the practice is not abused. For "[u]nless the question of general acceptance has been thoroughly litigated in the

previous cases, *** reliance on judicial practice is a hollow ritual." 2 J. Strong, McCormick on Evidence § 203, at 870 n.20 (4th ed. 1992); see also *State v. Cauthorn*, 120 Wash. 2d 879, 888-89, 846 P.2d 502, 506 (1993) (decisions from other jurisdictions may be examined but relevant inquiry is the general acceptance by scientists, not by the courts). However, in the instant case, given the expert testimony of record and the clear consensus evident from the material cited by the majority (see 173 Ill. 2d at 188-89), I have no difficulty in concluding that the DNA techniques employed by the State's expert are, in fact, generally accepted in the relevant scientific community.

Determining the appropriate standard of review for decisions regarding the admission of novel scientific evidence is more than an idle academic exercise. In certain cases, the standard of review may play a crucial, if not determinative role, in deciding the outcome of the case. See, *e.g.*, *Heaton*, 266 Ill. App. 3d 469. While the majority's decision today settles the ultimate question regarding the admissibility of DNA evidence, that result has unfortunately come at the expense of logic and clarity.