1-98-3778

1-98-3778         

)

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal From The

) Circuit Court

Plaintiff-Appellee, ) Of Cook County

)

)

)

RICARDO LIMA, ) Honorable

) Dennis Dernbach,

Defendant-Appellant. ) Judge Presiding

)

JUSTICE REID delivered the opinion of the court:

Following a jury trial, Ricardo Lima (Lima) was convicted of one count of first degree murder (720 ILCS 5/9-1 (West 1992)) and three counts of attempted first degree murder (720 ILCS 5/8-4, 9-1) (West 1992)) .  He was first sentenced to 60 years for the murder and to a 10-year concurrent sentence for the attempted murder.  Following a motion to reduce the sentence, Lima's sentence was reduced to 50 years for the first degree murder and to a 10-year 
consecutive
 sentence for the attempted first degree murder.  He now appeals the conviction and the revised sentence.  We affirm defendant's convictions and sentence for first degree murder and modify defendant's sentence for attempted first degree murder to run concurrently for the following reasons.

THE FACTS

Lima was 16 years old at the time of his arrest.  He was charged with first degree murder (720 ILCS 5/9-1 (West 1992)), attempted first degree murder (720 ILCS 5/8-4, 9-1 (West 1992)) and aggravated discharge of a firearm  (720 ILCS 5/24-1.2 (West 1992)) in connection with the shooting death of Armando Rodriguez (Rodriguez) and the shooting at Ruben Martinez (Martinez), Juan Ocun (Ocun) and Rocky Salazar (Salazar).

Prior to the trial, Lima moved to suppress his postarrest statement.  In that motion, Lima claimed he was coerced into signing his handwritten statement, that his requests to see his mother were ignored and that he was not informed of his constitutional rights at the time he made his statements.  Lima also moved to bar the introduction of evidence of gang involvement.  The trial court held a hearing on the motions in which the State called Detective Dennis Walsh (Walsh) and Lima called his mother, Kathleen Rivera (Rivera).  Walsh testified that he was investigating the shooting death of Armando Rodriguez.  After other officers had arrested Lima, Walsh testified he arrived on the scene.  Since Lima was a juvenile, Walsh claimed he contacted the Area 4 Youth Division and told them to have a youth officer available as soon as possible.  Walsh claimed he went into the interview room at approximately 12:45 a.m., introduced himself to Lima and informed him of his constitutional rights.  That phase of the interview lasted approximately 10 to 15 minutes.  At that time, according to Walsh, Lima denied his involvement in the shooting.  

At approximately 1:30 a.m., Walsh testified he went back into the interview room with youth officer Robert Mihajlov.  Walsh claimed the youth officer introduced himself and explained his role in the process, after which they began to discuss the shooting.  In an interview that lasted approximately 10 to 15 minutes, Walsh testified that Lima admitted some involvement in the shooting.  At 2 a.m., Walsh claims he allowed Kathleen Rivera to visit with her son for approximately 10 minutes.  He claimed that, upon leaving the interview room, Rivera told Walsh she had to go home for some medicine.  Walsh claimed Rivera left at that time.  Walsh next claimed he, Mihajlov and Assistant State's Attorney Michael O'Malley went back into the interview room at approximately 3 a.m.  O'Malley introduced himself and advised Lima of his rights.  He also informed Lima that, should the victim die, he could be charged as an adult.  According to Walsh, Lima again admitted his involvement in the crime.  At the conclusion of that interview, Walsh testified he told Lima's mother that she would be allowed to see her son.  

Walsh then testified that O'Malley wrote Lima's handwritten statement in Lima's presence.  Lima was allowed to make corrections but never refused to sign the handwritten statement.  According to Walsh, Lima never asked for the presence of an attorney or his mother.   Walsh claims no one ever refused to allow Lima's mother access to her son and never threatened or physically coerced Lima into signing the statement.  

Kathleen Rivera claimed that she got off work at approximately 10 p.m. on the night of the shootings.  She drove to Ohio and Oakley Streets to pick up her two sons.  Rivera claimed she was told that her son was just being questioned.  Electing to go to the police station instead of waiting at home to hear what would happen with her son, Rivera claimed she arrived at the police station between 11:30 and 11:45 p.m.  Rivera spoke with Detective Walsh, who told her she would not be able to immediately speak with her son because the State's Attorney had stepped out.  She was told she would be able to speak with her son when the State's Attorney returned.  Rivera claims that she had to ask Walsh to see her son seven or eight times.  At some point after she had made a few requests, she claims Walsh told her she was getting on his nerves and she might not get to see her son at all if she did not stop annoying him.

Rivera testified that she finally got to see her son at approximately 2 a.m.  She did not get to see her son in private, as she claimed six plainclothes police officers were inside the room.  She also testified that, when she finally got to see him, one side of Lima's face was swollen.  According to her, she asked Lima in Spanish about the injury to his face.  Lima allegedly responded that he could not talk about it, but he moved his eyes like he was trying to send a signal for her to drop her line of questioning.  

In closing arguments on the motion to suppress, Lima's counsel argued that, because he was 16 years old at the time of the arrest, Lima should have again been read his 
Miranda
 rights before the start of the second interview.  
Miranda v. Arizona
, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966).  The trial court found that Rivera's estimate of her arrival time was not accurate.  The trial court also found that Walsh was credible and that Rivera did get the chance to be alone with her son after the original oral statement was made and before the handwritten statement.  Finally, the trial court ruled it was unaware of any case law requiring police to give fresh warnings pursuant to 
Miranda
 each time they speak with a suspect. Additionally, the trial court denied a pretrial motion 
in
 
limine
 to bar introduction of evidence of Lima's gang involvement.  

A jury trial commenced in this case on January 27, 1998.  The State first called Salazar, a member of the Satan Disciples street gang, who testified he, Ocun and Rodriguez were passengers in a minivan driven by Martinez.  All were members of the Satan Disciples except Ocon, who was a member of the Latino Jivers street gang.  According to Salazar, the Satan Disciples and Latino Jivers were on friendly terms.  He also claimed there were no weapons in the vehicle.   After driving a while they dropped off Martinez at his girlfriend's home then continued to drive on Erie Avenue in Chicago.  Erie Avenue is the line of demarcation between the gang territory of the Latin Kings and C-Notes.  Salazar testified they saw seven or eight men on the sidewalk parallel to the minivan.  Salazar claimed these men were C-Notes and that one of them was Lima.  Salazar and Lima had known each other for a long time.  According to Salazar, Lima jumped off the sidewalk and into the street along the passenger side of the van.   Salazar, seeing Lima, ordered Martinez to increase speed because the C-Notes were outside.  Turning, Salazar claims he saw Lima fumbling with his clothing then heard shots fired.  Salazar estimated he heard five or six gunshots from behind the van.  One of the bullets flew past his shoulder, hitting the front metal part of the window, causing a spark.  Through the rearview mirror, Salazar claimed he saw Lima standing by himself in the street behind the van.  Salazar testified that, after realizing Rodriguez had been shot, they drove  him to the hospital.  On cross-examination, Salazar admitted to being a drug user and having been on drugs on the evening in question.  

Ocon was the next to testify.  He testified that he was a passenger in the van when someone jumped in the street and started shooting at them with a chrome gun.  Though Ocon could not see the face of the shooter, he claimed he could tell he was wearing a “hoodie” and a black coat.  He also testified he heard six shots fired.  

Martinez, currently serving a seven-year term in the Illinois Department of Corrections for arson and drug charges, testified next.  As he slowed down in front of his girlfriend's house, Martinez claimed he saw 10 to 15 people standing on the sidewalk.  He accelerated when he heard gunshots.  Martinez, who had been smoking marijuana that evening and claimed he did not know what was going on, sped away from the scene.  They then realized that Rodriguez had been shot in the head and would need to go to the hospital.  Martinez testified he drove Rodriguez to the Norwegian American Hospital, where they dropped off Rodriguez before going to get his parents and take them to the hospital.   Martinez acknowledged identifying Lima at a lineup and before the grand jury, but testified at trial that Lima was not the shooter.  

Chicago police officer James Shadur testified next.  He is an evidence technician assigned to the mobile unit of the crime laboratory.  On December 22, 1996, the night in question, Shadur responded to a call of a shooting at 2220 West Erie Avenue in Chicago.  When he arrived on the scene, the police had been protecting the crime scene.  Shadur spoke with the officers and detectives at the scene.  He then photographed the scene and surrounding areas and looked for physical evidence.  Shadur found six .9-millimeter cartridge cases on the south side of the street.  He also found a fired bullet on the sidewalk area of a house on a diagonal line from the crime scene, at 2204 West Erie Avenue.  This was further east than where he found the cartridge casings.  

After he processed the crime scene, Shadur went to Norwegian Hospital to process the van.  He photographed the van, finding a fired bullet on the front passenger's seat.  He also noticed holes in the exterior of the van.  Additionally, the rear window was shattered and a brake light had a bullet hole through it.  

Detective Thomas Flaherty testified next.  He was assigned to investigate the shooting with Detective Dennis Walsh and Detective Carlos Velez.  They learned that Rodriguez had been shot in the back of the head and would likely be transferred from Norwegian American Hospital to Cook County Hospital.  Once they arrived at Norwegian American Hospital, they spoke with  Martinez.  Martinez indicated at the time of the interview that Lima was the shooter.  Martinez also indicated that the van was parked in the hospital parking lot.  Flaherty examined the van.  He subsequently went to the scene of the shooting, where he saw spent shell casings and a fired bullet.  While he was there, Flaherty monitored a radio message that Lima had been arrested.  Flaherty next went to the location where Lima was arrested.  Lima was taken to Area 4 Violent Crimes by other police officers.  After Lima was taken into custody, Flaherty was present when Lima was identified in a lineup by Martinez and Salazar.  

Cook County Assistant State's Attorney Michael O'Malley next testified that he interviewed Martinez and Lima at the police station.  As to Lima, O'Malley claimed he explained that he was not Lima's lawyer.  O'Malley also testified he read Lima his 
Miranda
 rights after which Lima agreed to waive his rights and talk with him.  O'Malley confirmed that, after he explained the different types of statements that could be made, Lima chose to give a handwritten statement.  

O'Malley testified that he, Detective Walsh and youth officer Mihajlov left the room to give Kathleen Rivera a chance to be alone with her son.  Lima told O'Malley that his choice was not to have his mother present for the actual giving of the handwritten statement.  O'Malley testified he wrote out the statement.  He then had Lima read aloud his 
Miranda
 rights and the first few paragraphs of the statement.  O'Malley explained he read the remainder of the statement aloud, periodically asking Lima if he wanted to make any corrections or additions to the statement.  Lima indicated that he did not want to change anything.

In the handwritten statement, Lima admitted having been a member of the C-Notes gang since he was 10 years old.  He knew Martinez since he was five years old by his nickname “the professor.”  He knew Martinez was a member of the Satan Disciples, enemies of the C-Notes.  Lima admitted to keeping a gun in a garbage can behind his girlfriend's house where he would sometimes sleep.  On December 21, 1996, he took the gun from the garbage can and put it in the waistband of his pants.  Armed with the fully loaded gun, Lima went to Tammy Aceituno's home at 2309 West Grand in Chicago.  Once a larger group of C-Notes was present, they went to hang out on Oakley Street where Lima met more C-Notes.  The group of six decided to go to Erie Avenue, near Hoyne Street.  As they were walking eastbound on Erie Avenue, someone yelled out Ruben, which is Martinez' first name.  Lima indicated he turned around and saw the van he recognized as belonging to Martinez.  Lima, because of the bad blood between them,  began yelling obscenities at Martinez.  He claims Martinez responded in kind.  Lima then drew his gun and began shooting at the van.  After being hit by some of the bullets, the van sped off down Erie Avenue.  

After the shooting, Lima indicated he ran toward Leavitt Street with the gun at his side.  When he reached the Holy Rosary Church, Lima lifted a nearby sewer cap and disposed of the gun down the hole.  He then went back to Tammy Aceituno's house, where he stayed approximatly 15 minutes until the police arrived.  The statement concluded by stating that he was allowed to meet with his mother a couple of times, was fed, given beverages and allowed to use the washroom when necessary.  Additionally, the statement indicates Lima was not threatened or promised anything in exchange for making his statement.

In concluding the State's case in chief, certain stipulations were introduced.  Doctor Segovia, an expert in forensic pathology, would testify that her job as deputy medical examiner required her to perform a 
post
 
mortem
 on Rodriguez.  She found a gunshot entrance wound at the back of the victim's skull.  The path of the bullet extended from the entrance wound through his brain where it lodged.  In her expert opinion, Rodriguez died as a result of the single gunshot wound to the back of his head. 

The next stipulation was from Brian Mayland, a forensic evidence examiner for the Illinois State Crime Lab and expert in firearms analysis.  Mayland examined the bullet casings from the van and the one retrieved from Rodriguez's head.  Each of the bullets found was fired from the same weapon.  One of the bullets was damaged, so it could not be compared.  

Once the State's case in chief was concluded, Lima made a motion for directed verdict, which was denied by the trial court.  The defense next put on its case-in-chief, starting with Kathleen Rivera.  While she was working at the United Center, some police officers assigned there told her of an announcement on the radio that her sons had been arrested.  When she got off work, Rivera went to Ohio and Oakley Streets to pick up her other son Rafael.  Upon arrival she saw Rafael in handcuffs against a car.  Collecting her sister, Gina Falco, Rivera went to the Area 4 police station.  Rivera estimated she arrived at the police station at approximately 11:30 p.m.  Detective Walsh told her she could not see Ricardo right away.  She was allowed to see Ricardo at approximately 2 to 2:30 a.m.,  after he was interviewed by Assistant State's Attorney O'Malley.  Rivera testified that she was not allowed to be alone with Ricardo as there were five or six plainclothes officers present when she finally got to see him.  

Lima testified next.  He testified that he was a member of the C-Notes gang since he was 11 years old.  On the night in question, Lima and several of his fellow C-Notes were walking down Erie Street when they saw the van.  Lima claims he saw Salazar and Martinez in the front seat of the van while he was standing in the middle of the street.  Lima testified that Salazar yelled an obscenity at him.  He claimed that he and Martinez had been in an automobile accident the previous year at which time Martinez allegedly fired gunshots at Lima.  A week prior to the incident for which Lima was on trial, Lima testified that Martinez and some of his friends jumped out of a van and chased after him, brandishing baseball bats and golf clubs.  

In the case at bar, Lima claims that he saw the van begin to back up toward him.  Because he was afraid that some of the occupants were armed, Lima claims he fired his weapon at the van in self-defense and did not intend to kill anyone.  After the shooting, Lima ran to Leavitt Street, stopping at the Holy Rosary Church, where he threw the gun down a sewer.  

Lima testified that, once he was arrested, the police never let him tell his story or explain how the previous conflict with Martinez happened.  Lima also claimed that he initially refused to sign the written statement but, after being thrown against a wall by the police, who threatened to arrest his brothers as accessories, Lima signed the statement.  He also claimed he was only allowed to visit with his mother once and not until he signed the statement.  Further, Lima claims he was not given the choice as to what kind of statement to make or given the opportunity to simply tell what happened.  According to him, Lima only got the chance to answer yes or no to questions.  

On cross-examination, Lima admitted he knew the C-Notes and Satan Disciples were at war.  He admitted he was carrying a 9 millimeter pistol with him that he purchased from a man off the street.  While Lima claimed the gun was to protect himself from someone from whom he stole money, he claimed that it was not to protect him from Martinez.  Lima admitted he did not see weapons in the van when it drove by.  He also admitted that no one got out of the van prior to the firing of the first shots.  According to Lima, he asked for his mother and a lawyer at least 10 times but was refused.  

The defense next called Pamela Stiglich, who testified to witnessing the baseball bat and golf club incident.  She acknowledged she has a conviction for insurance fraud for which she received probation.  Stiglich admitted she did not call the police or report what she saw.  

After the defense rested, youth officer Mihajlov testified that, contrary to her testimony, Rivera did get to speak with her son alone.  Mihajlov also testified that Rivera had a second private meeting with her son after he had spoken with the Assistant State's Attorney.  Both of these meetings preceded his written statement.  He also testified that Lima did not want his mother present for some of the proceedings.  He further testified that no brutality took place and no one threatened that Lima's brothers would be held as accessories.  

Detective Walsh testified in rebuttal that Rivera was never denied access to her son.  He also denied throwing Lima against a wall or pipe as was alleged.  

The jury found Lima guilty of one count of first degree murder and three counts of attempted first degree murder.  A motion for new trial was made and denied.  Lima was sentenced to 60 years on the murder conviction with a 10-year concurrent term on the attempted murders.  He was given a credit for 498 days already served.  On motion, the sentence was later changed to reflect 50 years on the murder charge with a 10-year consecutive term on the attempt charges.

ANALYSIS

I

Lima argues that the trial court erred in denying the motion to suppress.  Lima contends that his 
Miranda
 warnings became stale and should have been repeated during the investigation.  He also argues that he was prevented from seeing his mother within a reasonable time of her arrival at the police station.

According to the Illinois Supreme Court, "in reviewing whether respondent's confession was voluntary, we will accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence.  However, we will review 
de
 
novo
 the ultimate question of whether the confession was voluntary."  
In re G.O.
, 191 Ill. 2d 37, 50 (2000).  “‛Whether a statement is voluntarily given depends upon the totality of the circumstances.  The test of voluntariness is whether the statement was made freely, voluntarily and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he confessed.’”  
People v. Miller
, 173 Ill. 2d 167, 181 (1996), quoting 
People v. Clark
, 114 Ill. 2d 450, 457 (1986).  In the case of a juvenile confession, there are extra factors to consider.  “‛Factors to consider include the [juvenile's] age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the duration of the questioning; and any physical or mental abuse by police, including the existence of threats or promises.’”  
People v. Golden
, 323 Ill. App. 3d 892, 900 (2001), quoting 
G.O.
, 191 Ill. 2d at 54.  “Also relevant is the ‛concerned adult’ factor: whether the juvenile before or during interrogation, had an opportunity to consult with an adult interested in his welfare.  This factor is especially relevant ‛in situations in which the juvenile has demonstrated trouble understanding the interrogation process, he asks to speak with his parents or another “concerned adult,” or the police prevent the juvenile's parents from speaking with him.’”  
Golden
, 323 Ill. App. 3d at 900, quoting 
G.O.
, 191 Ill. 2d at 55.  It is important to remember, however, “[n]o single factor is dispositive, and the failure to confer with a parent before or during interrogation does not 
per
 
se
 render a juvenile's statement involuntary.”  
Golden
, 323 Ill. App. 3d at 900; citing 
G.O.
, 191 Ill. 2d at 55.

In this case, the totality of the circumstances supports the trial court's denial of the motion to suppress.  While Lima's mother may not have been able to see her son as quickly as she would have otherwise preferred, the evidence shows that she did get to spend time with him.  In ruling on the motion to suppress, the trial court found that Lima's mother did get access.  This was supported by both the statement of Lima and the testimony of his mother, Rivera.  The trial court also found credible the statement of Detective Walsh that Rivera got to see her son alone.  The trial court also found 
sub
 
silencio
 that it disbelieved the claims that Lima was brutalized, threatened or intimidated while in custody.  We find no reason to disturb that ruling of the trial court.  

The remaining questions addressed by the trial court in the motion to suppress are whether the 
Miranda
 warnings were stale at the time Lima made his statement and, by extension, whether that statement was ultimately made.  
The Illinois Supreme Court has recently stated that “‛fresh 
Miranda
 warnings are not required after the passage of several hours.’”  
Miller
, 173 Ill. 2d at 182, quoting 
People v. Garcia
, 165 Ill. 2d 409, 425 (1995).  “A new set of 
Miranda
 warnings is required `only in those situations where a substantial probability exists that warnings given at a previous interrogation are so stale and remote that a substantial possibility exists that the suspect was unaware of his or her constitutional rights at the time subsequent interrogation occurs.' [citation.]  The totality of the circumstances should be considered in determining whether a defendant understands his constitutional rights in post-
Miranda
 questioning.”  
Miller
, 173 Ill. 2d at 182-83, quoting 
Garcia
, 165 Ill. 2d at 425-26.  In ruling on the motion, the trial court again found Detective Walsh credible.  Accordingly, the trial court found that Lima was given his 
Miranda
 warnings at approximately 12:45 a.m.  The trial court also found that subsequent 
Miranda
 warnings were given at 3 a.m. and 3:30 a.m.  Additionally, the trial court found that youth officer Mihajlov was present at the 1:30, 3 and 3:30 a.m. interviews.  Lima argues that 
Miranda
 warnings are ephemeral in nature, tending to evaporate like steam vapor on a bathroom mirror.  While it is true that, given enough time between the reading of the warnings and the start of questioning, a defendant, particularly an adolescent, could lose the benefit of them.  Based upon the guidance of the Illinois Supreme Court, the standard is as it should be, that the statement “‛“was not the product of ignorance of rights or of adolescent fantasy, fright or despair.”’”  
G.O.
, 191 Ill. 2d at 54, quoting 
People v. Simmons
, 60 Ill. 2d  173, 180 (1975), quoting 
In Re Gault
, 387 U.S. 1, 55, 18 L. Ed. 2d 527, 561, 87 S. Ct. 1428, 1458 (1967).  Based upon the totality of the record, and the passage of approximately 45 minutes from warning to statement, there is nothing which compels us to disturb the trial court's conclusions that Lima was aware of his rights at the time he gave his statement.

II

Lima next argues that the State violated the trial court's ruling on a motion 
in
 
limine
 in its cross-examination of the defendant by introducing evidence of another crime for which Lima was not on trial.  Prior to trial, Lima filed a motion 
in
 
limine
 seeking to bar certain parts of Lima's oral statement to Detective Walsh from being presented to the jury.  Specifically, the motion sought to bar the State from having Walsh testify that Lima told him that he had bought a gun to protect himself from a drug dealer from whom Lima had previously stolen money.  The motion was granted and the State did not use the statement in its case in chief.  

During his direct examination, Lima admitted to possessing a gun during the incident.  The State asked Lima why he had the gun, to which he responded that he acquired the gun for his own protection.  The follow-up question was asked to determine from whom Lima felt he needed protection.  Defense counsel objected to the follow-up question and not the prior question of why he had the gun at all.

Including the question which generated the objection, the following discussion took place:

“Q. And in the two to three weeks before this shooting happened, you carried that gun with you, is that correct?

A. Yes, that is.

Q. Wherever you might go, is that correct?

A. Yes.

Q. And when you carried it with you would you normally keep it in your coat pocket or in your waistband?  Where would you keep it?

A. It depends on where I go, but most of the time, I keep it in my –  in my waistband or wherever I can put it.

Q. Because you want to have it handy in case you might need to use it, is that right?

A. Yes.

Q. Why did you get the gun?

A. For my protection.

Q. Well, for your protection from whom?

THE DEFENSE: Objection.

A. For my protection.

THE COURT: Overruled.

THE DEFENSE: We went over this area.  Sidebar.

* * *

[Non-Publishable Under Supreme Court Rule 23 omitted here.]

(After the conclusion of the sidebar, the following proceedings were held before the jury:)

“THE STATE:  Mr. Lima, who did you have the nine millimeter pistol to protect yourself from?

A. My protection.

Q. Excuse me?

A. From my protection.

Q. Who?

THE COURT: For your protection?

A. Yes.

THE COURT: The question is from who?

A. Who?

THE COURT: Who.

A. Somebody I stole money from.

THE COURT:  Somebody I stole money from?

A. Yes.

THE COURT: Go ahead.

THE STATE: Was it Ruben Martinez?

A. No, it was not.”

The State argues that the line of questioning was proper as relevant to the issue of self-defense since the probative value outweighed any prejudicial effect because Lima bought the gun to protect himself from someone other than Martinez.  The trier of fact had to determine whether the shooting was an act of aggression or of protection.  Without allowing that testimony in, the State argues it would have been possible for the jury to get the wrong impression that Lima bought the gun to protect himself from Martinez.  The State also argues that, since Lima chose to testify, his credibility was certainly an issue for the jury to consider.  

Evidence of collateral crimes, 
i.e.
, crimes for which the defendant is not on trial, is inadmissible if relevant merely to establish the defendant's propensity to commit crimes.  
People v. Lindgren
, 79 Ill. 2d 129, 137 (1980), citing 
Michelson v. United States
, 335 U.S. 469, 475-76, 93 L. Ed. 168, 173-74, 69 S. Ct. 213, 218-19 (1948).  The sound rationale for that rule is that “[s]uch evidence overpersuades the jury, which might convict the defendant only because it feels he or she is a bad person deserving punishment.” 
Lindgren
, 79 Ill. 2d at 137.  “Few evidentiary issues receive as much reviewing court attention as the use of other offense evidence in criminal cases.  While the principles of law that apply to other offense evidence are easy to find and summarize, their application in a particular case, being fact-intensive, is a different matter.”  
People v. Bedoya
, 325 Ill. App. 3d  926, 937 (2001).  The standard for admissibility of other crimes evidence has not been clearly established in Illinois.  It is more than mere suspicion, but less than beyond a reasonable doubt.  
Bedoya
, 325 Ill. App. 3d at 938,  citing M. Graham, Cleary & Graham’s Handbook of Illinois Evidence §404.5, at 241 (7th 
ed. 1999).  

The United States Supreme Court has said other offense evidence is admissible when the jury could reasonably find by a preponderance of the evidence that the defendant committed the other offense. 
Bedoya
, 325 Ill. App. 3d at 938, citing 
Huddleston v. United States
, 485 U.S. 681, 99 L. Ed. 2d 771, 108 S. Ct. 1496 (1988).  Even when admitted, the other offense evidence must not become the focal point of the trial.  
Bedoya
, 325 Ill. App. 3d at 938, citing 
People v. Thigpen
, 306 Ill. App. 3d 29, 37 (1999).

As an exception to the above rule, “[e]vidence of a defendant's commission of other crimes is generally admissible when it is relevant to prove a material question other than the defendant's propensity to commit the crime charged, such as 
modus
 
operandi
, intent, identity, motive, or absence of mistake.”  
People v. Wassell
, 321 Ill. App. 3d 1013, 1017 (2001), citing 
People v. Kliner
, 185 Ill. 2d 81, 146 (1998).  Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence in the case more probable or less probable than it would be without the evidence.  
Bedoya
, 325 Ill. App. 3d at 937, citing 
People v. Green
, 322 Ill. App. 3d 747, 757 (2001).  A trial court's ruling on the admissibility of other crimes evidence will not be reversed absent a clear abuse of discretion.  
Wassell
, 321 Ill. App. 3d at 1017; citing 
Kliner
, 185 Ill. 2d at 146; 
People v. Placek
, 184 Ill. 2d 370, 385 (1998); 
Bedoya
, Slip op. at 17.  The use of this evidence comes with certain caveats.  Chief among them is the idea that even where the evidence is relevant for a permissible purpose, the trial judge must conduct a balancing test,  weighing the prejudicial effect of admitting the other crimes evidence against its probative value.  
People v. Robinson
, 167 Ill. 2d 53, 63 (1995), citing 
People v. Stewart
, 105 Ill. 2d 22, 62 (1984).  The danger of unfair prejudice speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged.  
Bedoya
, 325 Ill. App. 3d at 940, citing 
Old Chief v. United States
, 519 U.S. 172, 180, 136 L. Ed. 2d 574, 588, 117 S. Ct. 644, 650 (1997).

Lima argues that by allowing the inquiry described above, the trial court essentially negated its own ruling on the motion 
in
 
limine
.  We disagree, based on the unique factual posture of this case.  The defense did not object when Lima was asked why he got the gun.  Instead, the defense objected to the question of from whom Lima felt he needed protection.  Had they objected to the former, the trial court could have protected the integrity of the motion 
in
 
limine
 by either sustaining the objection or instructing counsel to limit the questions.  For example, better practice might have been to instruct counsel to ask a leading question, such as “you didn't acquire the gun to protect yourself from Ruben Martinez, did you?”  Absent such a limiting instruction, the question “from whom?” is a logical followup to the defendant's statement that he got the gun for his own protection.  As asked and answered, “for my protection” could give the jury the wrong impression that the protection is necessary from the victim of this crime.  Since the trial court's responsibilities include weighing probative value against prejudicial effect, we find, as the events transpired, the trial court struck a reasonable balance.  The fact that Lima responded to the “who” question by freely volunteering that protection was needed from “somebody I stole money from” is precisely why lawyers have to be mindful to properly prepare their clients for the rigors of testifying at trial.  We can only imagine defense counsel's agony, once Lima voluntarily said he needed protection from “somebody I stole money from.”  W
e therefore decline to reverse this case on the issue of the other crimes evidence.  The decision to allow the inquiry was within the trial court's sound judicial discretion.  

III

Lima next argues that the State's rebuttal argument inappropriately invoked the integrity of the prosecution to attack the credibility of the defendant, depriving defendant of a fair trial.

Generally, "[i]n presenting a closing argument, the prosecutor is allowed a great deal of latitude and is entitled to argue all reasonable inferences from the evidence."  
People v. Nieves
, 193 Ill. 2d 513, 532-33 (2000),  citing 
People v. Johnson
, 146 Ill. 2d 109, 143 (1991).  A prosecutor may comment on, but may not enhance, the credibility of the State witnesses.  
People v. Montgomery
, 254 Ill. App. 3d 782, 794 (1993), citing 
People v. Ford
, 113 Ill. App. 3d 659 (1983).

Defendant points to the prosecutor's remarks in rebuttal in which he argued that the detective and youth officer would not risk their pensions to frame the defendant.  The prosecutor further argued that the felony review Assistant State's Attorney had been a teacher in poor areas of the Third World and this country for more than 20 years prior to becoming a lawyer and that this fact made it less likely that he would risk his law license to frame defendant.  While not cited by the defense, such comments have been held to be improper by this court in 
People v. Fields
, 258 Ill. App. 3d 912 (1994), and 
People v. Montgomery
, 254 Ill. App. 3d 782 (1993).

     The State responds that these remarks were made in response to defense counsel's closing argument,  which directly challenged the testimony of the police and the Assistant State's Attorney, citing 
People v. Cox
, 197 Ill. App. 3d 1028 (1990), and 
People v. Young
, 206 Ill. App. 3d 789 (1990).  See also 
People v. Cross
, 272 Ill. App. 3d 354 (1995).

We must note, however, that defense counsel's closing argument was responsive to the State's initial closing argument, which similarly invoked the possible loss of the police officers' pensions and Assistant State's Attorney's law license as grounds for the jury to reject the possibility that the testimony of those witnesses was less than credible.  Consequently, we found the State's cited cases to be inapposite.  Our research has revealed that this court has held that such remarks may be proper in response to the trial strategy of defense counsel.  
People v. Davis
, 228 Ill. App. 3d 835, 839 (1992).  However, we need not decide whether the complained-of remarks were proper or improper in the context of the instant case as we find the issue has been waived.

Lima waived this issue by not objecting to the statements at trial and by failing to include them in the motion for new trial.  "To preserve an issue of review, a defendant must both contemporaneously object at trial and include the specific alleged error in a written posttrial motion.  Failure to raise an issue in a written posttrial motion constitutes a waiver of the issue and it cannot be considered on appeal." 
 
People v. Ramos
, 318 Ill. App. 3d 181, 186 (2000), citing 
People v. Enoch
, 122 Ill. 2d 176, 186-87 (1988). 

In the instant case, defense counsel did not object to any relevant portion of the State's initial closing argument and only objected to a reference to Rodney King in the State's rebuttal argument.  By failing to object, defense counsel deprived the trial court of any opportunity to rule on or correct the alleged errors in the prosecution's closing and rebuttal arguments.  Defense counsel also failed to make objections to any specific comments in his posttrial motion.  We are mindful that "pursuant to Supreme Court Rule 615(a)(134 Ill. 2d R. 615(a)), this court may review an argument not properly preserved if we determine that plain error affecting a substantial right has occurred."  
People v. Chapman
, 194 Ill. 2d 186, 225-26 (2000), citing 
People v. Shaw
, 186 Ill. 2d 301, 326 (1998).

Under this doctrine, a reviewing court may address trial defects even though these defects were not properly brought to the attention of the trial court.  134 Ill. 2d R. 615(a).  However, review under this doctrine is available only "in those limited cases" where it is obvious from the record that the claimed error affected the defendant's substantial rights.  
People v. Steidl
, 142 Ill. 2d 204, 243 (1991); see also 
People v. Munson
, 171 Ill. 2d 158, 195-96 (1996), quoting 
People v. Precup
, 73 Ill. 2d 7, 17 (1978).

Even so, not all errors affecting a defendant's substantial rights merit review under this doctrine.  
Munson
, 171 Ill. 2d at 196.  To be "plain," the claimed error must have resulted in unfairness.  
People v. Keene
, 169 Ill. 2d 1, 17 (1995).  The Illinois Supreme Court has determined that this "occurs only in situations which 'reveal breakdowns in the adversary system,' as distinguished from 'typical trial mistakes.'" 
Keene
, 169 Ill. 2d at 17, quoting Wangerin, "
Plain Error" 
and 
"Fundamental Fairness": Toward a Definition of Exceptions to the Rules of Procedural Default
, 29 DePaul L. Rev. 753, 778 (1980).  That is, plain error exists only when the essential fairness of a trial has been undermined.  
Keene
, 169 Ill. 2d at 17.  If the claimed error does not rise to this level of prejudice, it cannot be reviewed.  
Keene
, 169 Ill. 2d at 17.

Therefore, in order to invoke the plain error doctrine as an exception to the waiver rule (
People v. Durgan
, 281 Ill. App. 3d 863, 867 (1996)), the claimed error must have either affected the defendant's substantial rights, thereby depriving him of a fair and impartial trial, or, independent of the rights affected, the evidence at trial simply must have been "closely balanced" (
Keene
, 169 Ill. 2d at 18; 
People v. Fields
, 135 Ill. 2d 18, 70 (1990)).

In the instant case, the record shows significant evidence supporting the convictions found by the jury.  This is not a close case upon which we would be justified in overturning the jury's verdict.  In sum, defendant has failed to show that the prosecutor's rebuttal argument constituted plain error.

IV

Lima next argues that the sentence of 60 years is an abuse of discretion because it negates the opportunity for rehabilitation and is disproportionate to his background.  The State responds that a sentence of 50 years for first degree murder and a consecutive sentence for attempted first degree murder is not excessive where the trial court considered relevant factors in aggravation and mitigation.  We affirm the 50-year sentence as being within the trial court's discretion.  We modify the 10-year sentence to run concurrently with the 50-year murder sentence.

Sentence determinations rest within the sentencing judge's discretion.  
People v. Rogers
, 197 Ill. 2d 216 (2001).  A trial court is vested with wide discretion in imposing a sentence, and if a sentence is within statutory limits, a reviewing court will not disturb it absent an abuse of that discretion.  
People v. Vida
, 323 Ill. App. 3d 554, 573 (2001), citing 
People v. Kyles
, 303 Ill. App. 3d 338, 354 (1998).  The trial court is in the best position to observe the defendant and consider factors such as credibility, demeanor, moral character, mentality, social environment, habits and age.  
People v. Golden
, 323 Ill. App. 3d 892, 905 (2000), citing 
People v. Streit
, 142 Ill. 2d  13, 19 (1991).  In determining a sentence, the trial court must balance the interests of society against the ability of a defendant to be rehabilitated.  
People v. Tye
, 323 Ill. App. 3d 872, 890 (2001), citing 
People v. Banks
, 241 Ill. App. 3d 966, 982 (1993).  Although the sentencing court was required to consider defendant's rehabilitative potential, it was not required to give greater weight to that factor than to the seriousness of the offense or other aggravating factors.  
Tye
, 323 Ill. App. 3d at 890, citing 
People v. Fort
, 229 Ill. App. 3d 336, 341-42 (1992).  In fact, the seriousness of the crime committed is considered the most important factor in fashioning an appropriate sentence.   
Tye
, 323 Ill. App. 3d at 890, citing 
People v. Adamcyk
, 259 Ill. App. 3d 670, 681 (1994).  A court is not required to set forth every reason or the weight it gave each factor considered in determining a defendant's sentence.   
Tye
, 323 Ill. App. 3d at 890, citing 
People v. Brajcki
, 150 Ill. App. 3d 506, 515 (1986).  “‛A sentence within the statutory guidelines that is alleged to be excessive will not be disturbed on review unless it is manifestly disproportionate to the nature of the offense.’”  
Golden
, 323 Ill. App. 3d at 905, quoting 
People v. Costello
, 224 Ill. App. 3d 500, 510 (1992).

The 50-year sentence received by Lima is within the statutory guidelines and is not manifestly disproportionate to the offense of murder.  While Lima recognizes that every murder is a terrible crime, he argues that some murders are such that 20 years is a sufficient penalty.  To wit, he argues his then status as a minor with an absentee father should serve to mitigate against the violence and recklessness of firing multiple gunshots at a moving van.  While this argument is certainly food for thought, it is not an abuse of discretion simply because the defendant feels the number of years is too large.  As a court of appeals, we do not have the luxury of being able to second-guess the trial court merely because we might have, had we been the trier of fact, reached a different result.  Criminal courts have responsibilities extending beyond the parties in the case.  As representatives of the judicial branch of government, judges' decisions include protecting the public from those individuals who would breach the social compact by firing weapons into occupied moving vehicles in the way Lima did.  For Lima to now argue that the trial court erred in imposing the sentence it did because he lacked other adult criminal convictions is pure sophistry.  As the State correctly points out, at the time of the murder Lima was a minor.  It is, therefore, impossible for him to have had an adult criminal record.  He did, as it happens, have a juvenile criminal record which was considered by the trial court in imposing the sentence.  As a judge one must, by the very nature of the job, consider all the relevant factors.  We believe the trial court did so at the aggravation and mitigation phase of the trial.  We can find no basis for upsetting the sentencing decision of the trial court as to defendant's murder conviction.

While neither party raised the propriety of defendant's consecutive 10-year sentence for attempt first degree murder, we are compelled to do so.  The imposition of sentences violative of section 5-8-4(a) of the Unified Code of Corrections (730 ILCS 5/5-8-4(a) (West 1996)) are void and courts of review may address this issue 
sua
 
sponte
.  
People v. Arna
, 168 Ill. 2d 107 (1995).  The crimes for which defendant was convicted occurred on December 23, 1996.  At that time, section 5-8-4(a)(i) of the Unified Code of Corrections (730 ILCS 5/5-8-4(a) (West 1996)) required consecutive sentences for "a Class X or Class 1 felony and the defendant inflicted severe bodily harm."  
People v. Curry
, 178 Ill. 2d 509, 538 (1997), held that "consecutive sentences are mandatory only for those offenses which trigger the application of section 5-8-4(a)."  In 
People v. Whitney
, 188 Ill. 2d 91 (1999), our supreme court reviewed a case that is factually similar to ours.  There, the defendant shot at the occupants of a car.  The driver of the car died of multiple gunshot wounds but the passenger was not struck.  A jury convicted the defendant of murder of the driver and aggravated discharge of a firearm with respect to the passenger.  The trial court sentenced the defendant to 50 years for the murder and 15 years on the aggravated discharge, with the sentences to run consecutively.  The supreme court affirmed the appellate court's reversal (
People v. Whitney
, 297 Ill. App. 3d 965 (1998)) of the consecutive sentence.  In doing so, the court said: "[W]e construe the first exception under section 5-8-4(a) as requiring consecutive sentencing where the defendant has been convicted of either a Class X or Class 1 felony and where he had inflicted severe bodily injury during the commission of 
that
 felony."  (emphasis added.)  
Whitney
 188 Ill. 2d  at 98-99.  The court then applied this reasoning to the facts in 
Whitney
 and held:

"First degree murder is not a Class X or Class 1 felony; rather, it is its own class of felony. [Citation.]  Aggravated discharge of a firearm is a Class 1 felony. [Citation.]  Defendant's conduct, however, in committing the offense of aggravated discharge of a firearm did not result in severe bodily injury to the victim of that felony, [the passenger].  We therefore hold that the requirements for the first exception under section 5-8-4(a) have not been satisfied.  Consequently, consecutive sentences are not warranted in this case."  
Whitney
, 188 Ill. 2d  at 100.

In the case 
sub
 
judice
 none of the attempted murder victims were injured.  Consequently, applying 
Whitney
, defendant's consecutive 10-year sentence for attempt first degree murder must be made to run concurrently with defendant's 50-year first degree murder sentence.  We note, however, that in the year 2000 section 5-8-4(a) was amended by the legislature to make first degree murder a triggering offense.  That amendment, of course, cannot relate back to the prior offense in this case.

V

Lima next argues that he is entitled to day-for-day good-conduct credit and a recalculation of his sentencing credit pursuant to 
People v. Reedy
, 186 Ill. 2d 1(1999).  Subsequent to his sentencing the Illinois Supreme Court found unconstitutional Public Act 89-404 (Pub. Act 89-404, eff. Aug. 20, 1995)  As a result, Lima argues that, for an offense which occurred prior to June 19, 1998, he is entitled to a day-for-day good-conduct credit.  
People v. Dean
, 303 Ill. App. 3d 758 (1999).  

The State responds that this court should leave the business of calculating appropriate day-for-day good-conduct credit to the Illinois Department of Corrections.  We agree.  “Recalculation of the sentence credit to which defendant is entitled is a matter for the Illinois Department of Corrections.”  
People v. Davis
, 303 Ill. App. 3d 684, 688 (1999).   Since the defendant should automatically receive any allowable day-for-day credit for good conduct, it is not necessary for this court to order the Illinois Department of Corrections to take any action.

CONCLUSION

In light of the foregoing, the decision of the trial court is affirmed as to defendant's convictions and sentence for first degree murder and we modify defendant's sentence for attempted first degree murder to run concurrently.

Affirmed as modified.